LAUREN A. DEAN
**MAGNANIMO DEAN LAW APC**
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367
Tel:     (818) 305-3450
Fax:     (818) 305-3451
Email: Lauren@MagDeanLaw.com

THOMAS J. MCKENNA
GREGORY M. EGLESTON
**GAINEY MCKENNA & EGLESTON**
501 Fifth Avenue, 19th Floor
NY, NY 10017
Tel:     (212) 983-1300
Fax:     (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| TOM HEIL, Derivatively on Behalf of Nominal Defendant VOLTA, INC., | CASE NO.: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| ELI AHETO, CHRISTOPHER WENDEL, VINCENT T. CUBBAGE, MARTIN LAUBER, KATHERINE J. SAVITT, BONITA C. STEWART, JOHN J. TOUGH, SCOTT MERCER AND FRANCOIS P. CHADWICK, | |
| Defendants, | |
| -and- | |
| VOLTA, INC., | |
| Nominal Defendant. | |

Plaintiff Tom Heil ("Plaintiff"), on behalf of Volta, Inc. ("Volta" or the "Company"),

derivatively, allege the following based upon personal knowledge as to himself and his own acts, and upon information and belief and investigation of counsel as to all other matters.  That investigation included, among other things, a thorough review and analysis of public documents, court filings, press releases and news articles concerning Volta, and the other facts as set forth herein:

### NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of and for the benefit of Volta, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties, among other things discussed below.  Defendants' actions have caused, and will continue to cause, substantial financial harm and reputational damage to Volta.

### JURISDICTION AND VENUE

2.      Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of Sections 10(b) and 21D the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

3.      The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in California or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains executive offices in this District, including Nominal Defendant Volta, a substantial portion of the transactions and wrongs complained of herein – including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to Volta – occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

5.      In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## PARTIES

### Plaintiff

6. **Plaintiff Tom Heil** is a current Volta shareholder during the relevant period. Plaintiff will continue to hold Volta shares throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7. Nominal Defendant Volta is a Delaware corporation Delaware with its principal executive offices located in San Francisco, California.  The Company is an electric vehicle ("EV") infrastructure company focused on building a network of EV charging stations.

### Director Defendants

8. **Defendant Eli Aheto** ("Aheto") has served as a Company director since August 2021.  Prior, Defendant Aheto served as a director for Legacy Volta[1] from October 2016 to August 2021. Defendant Aheto is also Chair of the Audit Committee.  For the 2021 Fiscal Year, Defendant Aheto received $27,826 in total compensation from the Company, which only consisted of cash compensation.

9. **Defendant Vincent T. Cubbage** ("Cubbage") has served as the Company's Interim Chief Executive Officer ("CEO") since June 2022 and as a Company director since August 2021. Defendant Cubbage is the chair of the Nominating and Corporate Governance Committee and also a member of the Audit Committee.  For the 2021 Fiscal Year, Defendant Cubbage received $27,826 in total compensation from the Company, which only consisted of cash compensation.

[1] Founded in 2010, Legacy Volta, at the time known as Volta Industries, Inc., was a private entity and only became public after a business combination with Tortoise Acquisition Corp. II ("Tortoise"), a publicly traded special purpose acquisition company.  On February 8, 2021, Tortoise filed a current report on Form 8-K, informing investors about the Business Combination.

10.     **Defendant Martin Lauber** ("Lauber") has served as a Company director since August 2021.  Before, Defendant Lauber served as a director for Legacy Volta from June 2020 to August 2021.  Defendant Lauber is also a member of both the Compensation Committee and the Nominating and Corporate Governance Committee.  For the 2021 Fiscal Year, Defendant Lauber received $25,217 in total compensation from the Company, which only consisted of cash compensation.

11.     **Defendant Katherine J. Savitt** ("Savitt") has served as a Company director since August 2021.  Defendant Savitt is also a member of both the Compensation Committee and the Nominating and Corporate Governance Committee, and since her appointment on June 12, 2022, the Chairperson of the Board.  For the 2021 Fiscal Year, Defendant Savitt received $35,652 in total compensation from the Company, which only consisted of cash compensation.

12.     **Defendant Bonita C. Stewart** ("Stewart") has served as a Company director since March 2021.  Defendant Stewart is also a member of both the Compensation Committee and the Nominating and Corporate Governance Committee.  For the 2021 Fiscal Year, Defendant Stewart received $25,217 in total compensation from the Company, which only consisted of cash compensation.

13.     **Defendant John J. Tough** ("Tough") has served as a Company director since August 2021.  Before, Defendant Tough served as a director for Legacy Volta from May 2019 to August 2021.  Defendant Tough is the chair of the Compensation Committee and is also a member of the Audit Committee.  For the 2021 Fiscal Year, Defendant Tough received $29,565 in total compensation from the Company, which only consisted of cash compensation.

14.     Defendants Aheto, Cubbage, Lauber, Savitt, Stewart, and Tough are collectively referred to herein as "Director Defendants".

**Officer Defendants**

15.     **Defendant Scott Mercer** ("Mercer") is a co-founder of Legacy Volta and served as the Company's CEO during the relevant period.  For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Mercer received $179,423,048 in total compensation from the

1    Company.  This included $437,500 in salary, $500,000 in bonus, $178,402,500 in stock awards,

2    and $83,048 in other compensation.

3        16.    **Defendant Francois P. Chadwick** ("Chadwick") served as the Company's Chief

4    Financial Officer ("CFO") during the relevant period.  For 2021 Fiscal Year, Defendant Chadwick

5    received $9,671,612 in total compensation from the Company.  This included $280,000 in salary,

6    $400,000 in bonus, $6,464,697 in stock awards, $2,515,000 in option awards and $11,915 in other

7    compensation.

8        17.    The Director Defendants and Defendants Mercer and Chadwick are collectively

9    referred to herein as the "Defendants".

10                            **SUBSTANTIVE ALLEGATIONS**

11       18.    On August 2, 2021, Defendants caused the Company to file its proxy statement and

12   prospectus on Form 424b3, soliciting stockholder approval of the Business Combination (the

13   "Proxy Statement").   The Proxy Statement stated that following the closing of the business

14   combination "Messrs. Mercer and Wendel will hold approximately 37.3% of the voting power" of

15   the Company because they held all of the issued and outstanding Class B common shares.  Class B

16   shares have ten votes per share, while Class A shares have one vote per share.  Under Risk Factors,

17   the Proxy Statement stated:

18       ***If Volta is unable to attract and retain key employees and hire qualified***
         ***management, technical, engineering and sales personnel, its ability to compete***
19       ***and successfully grow its business would be harmed.***  [Emphasis added].

20       Volta's success depends on the continuing services of key employees, including
         members of its management team. The loss of any of these individuals could have
21       a material adverse effect on Volta's business, financial condition and results of
         operations. Volta's success also depends, in part, on its continuing ability to
22       identify, hire, attract, train and develop and retain highly qualified personnel. The
         inability to do so effectively would adversely affect its business. Competition for
23       employees can be intense, particularly in the San Francisco Bay Area where Volta
         is headquartered, and the ability to attract, hire and retain them depends on Volta's
24       ability to provide competitive compensation. In addition, Volta competes for
         qualified personnel with its other competitors in the EV charging industry, who
25       may seek to hire Volta's employees from time to time due to their industry
         expertise. Volta may not be able to attract, assimilate, develop or retain qualified
26       personnel in the future, and failure to do so could adversely affect its business,

27

28

including its growth prospects and ability to expand into new markets and geographies.

19.     The Proxy Statement also reported selected financial data for Legacy Volta, including:

> Behavior and Commerce revenue increased by $2.4 million, or 212%, from March 31, 2020 to March 31, 2021, primarily due to large sales of media campaigns with several national brands in the three months ended March 31, 2021. Network Development revenue decreased by $1.3 million, or 57%, from March 31, 2020 to March 31, 2021, primarily due to a decrease in installation service revenue of $0.7 million due to less construction activity occurring in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 and a decrease in infrastructure sales of $0.8 million due to no infrastructure sales occurring in the first quarter of 2021, offset by an increase in operations and maintenance revenue of $0.2 million due to an increase in the number of cumulative completed projects. Charging Network Operations revenue decreased by $0.5 million, or 100%, from March 31, 2020 to March 31, 2021, due to no regulatory credit sales occurring in the three months ended March 31, 2021.

> Volta has earned $0.2 million in Network Intelligence revenue since it began generating Network Intelligence revenue in November 2020.

> * * *

> *Selling, General and Administrative*

> Selling, general and administrative expenses increased by $50.3 million, or 475%, for the three months ended March 31, 2021 as compared to the three months ended March 31, 2020. This was primarily driven by an increase in non-cash stock-based compensation of $45.3 million, driven primarily by the issuance of restricted stock awards to executive employees in the first quarter of 2021. This was also driven by an increase in legal, finance, tax and accounting services expense of $1.4 million, an increase in payroll costs for salaried employees of $1.7 million and an increase in research and development prototyping expense of $1.2 million related to charging technology improvement efforts. The payroll related cost increase was mainly driven by an increase in Volta's salaried employee headcount to 153 from 136 for the three months ended March 31, 2021 and 2020, respectively.

> * * *

> *Net Loss*

> Net Loss increased by $52.1 million, or 397%, from March 31, 2020 to March 31, 2021, primarily due to an increase of $1.1 million in cost of revenues, an increase of $51.1 million in operating expenses and an increase in interest expense of $0.6 million, partially offset by a $0.8 million increase in revenue.

20.     The Proxy Statement further disclosed certain material weaknesses in Legacy Volta's internal control over financial reporting:

In connection with the preparation and audit of Volta's consolidated financial statements for the years ended December 31, 2020 and 2019, material weaknesses were identified in its internal control over financial reporting.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of Volta's annual or interim financial statements will not be prevented or detected on a timely basis. The following deficiencies in internal control over financial reporting were identified as material weaknesses:

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions and asset retirement obligations, commensurate with its accounting and reporting requirements.

- Volta did not maintain a sufficient complement of personnel to ensure appropriate segregation of duties to ensure that all journal entries and reconciliations were reviewed by an individual other than the preparer. Additionally, the Chief Financial Officer had inappropriate access rights in the general ledger system.

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately prevent, detect or correct material misstatements which resulted in a high volume of correcting journal entries recorded subsequent to year-end; and

- Volta did not design and maintain effective controls over certain information technology general controls for information systems that are relevant to the preparation of its consolidated financial statements. Specifically, Volta did not design and maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration.

21.     On August 26, 2021, the Company announced the closing of the Business Combination.

22.     On November 10, 2021, the Company announced its third quarter 2021 financial results in a press release that stated, in relevant part:

**Results for Third Quarter 2021**

Revenue grew 77% YoY to $8.5 million, compared to $4.8 million in the prior-year period, largely attributable to strong growth within Behavior and Commerce. Behavior and Commerce revenue grew to $7.4 million from $2.2 million in the prior-year period, primarily due to increased sales of media campaigns with national brands. Network Development revenue decreased YoY due to a decrease in customer-owned installations.

\* \* \*

Selling, general and administrative expenses were ***$29.0 million***, compared to $9.0 million in the prior-year period. This was primarily due to planned growth initiatives that resulted in increased costs, including bonuses and commissions of $2.2 million and additional insurance costs of $1.2 million, ***with one-time expenses related to non-cash stock-based compensation of $4.2 million*** and professional services fees of $3.2 million incurred related to the de-SPAC process. ***Net loss was $43.1 million***, compared to a loss of $14.5 million in the prior-year period, and earnings before interest, taxes, depreciation and amortization (EBITDA) was a loss of $38.3 million compared to a loss of $9.5 million in the prior-year period. [Emphasis added].

\* \* \*

**Full Year 2021 Outlook**

Based on current business conditions, business trends and other factors, for the full year ending December 31, 2021, the Company expects:

- Revenue in the range of $32 million to $36 million
- Total signings to be in the range of 600 sites to 700 sites
- Total operational stalls in the range of 2,300 to 2,500, with 1,300 plus stalls in our construction queue.

23.     On November 12, 2021, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"), substantially affirming the previously reported financial results.  Specifically, it stated: Compensation expense related to stock-based awards was recorded in selling, general and administrative in the condensed consolidated statements of operations and comprehensive loss for $4.6 million and $0.3 million for the three months ended September 30, 2021 and 2020, respectively, and $51.4 million and $0.8 million for the nine months ended September 30, 2021, and 2020 respectively.

24.     The 3Q 10-Q repeated the previously disclosed material weaknesses:

As disclosed in our prospectus filed pursuant to Rule 424(b)(3) of the Securities Act on September 29, 2021, in connection with the preparation of Volta's condensed consolidated financial statements as of and for the years ended December 31, 2020 and 2019, certain material weaknesses were identified in Volta's internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of Volta's interim or annual condensed consolidated financial statements will not be prevented or detected on a timely basis. The material weaknesses were as follows:

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions and asset retirement obligations, commensurate with its accounting and reporting requirements.

- Volta did not maintain a sufficient complement of personnel to ensure appropriate segregation of duties to ensure that all journal entries and reconciliations were reviewed by an individual other than the preparer. Additionally, the Chief Financial Officer had inappropriate access rights in the general ledger system.

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately prevent, detect or correct material misstatements which resulted in a high volume of correcting journal entries recorded subsequent to year-end; and

- Volta did not design and maintain effective controls over certain information technology general controls for information systems that are relevant to the preparation of its condensed consolidated financial statements. Specifically, Volta did not design and maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration.

25.     Under "Risk Factors," the 3Q21 10-Q stated:

***If Volta is unable to attract and retain key employees and hire qualified management, technical, engineering and sales personnel, its ability to compete and successfully grow its business would be harmed.*** Volta's success depends on the continuing services of key employees, including members of its management team. The loss of any of these individuals could have a material adverse effect on Volta's business, financial condition and results of operations. Volta's success also depends, in part, on its continuing ability to identify, hire, attract, train and develop and retain highly qualified personnel. The inability to do so effectively would adversely affect its business. Competition for employees can be intense,

particularly in the San Francisco Bay Area where Volta is headquartered, and the ability to attract, hire and retain them depends on Volta's ability to provide competitive compensation. In addition, Volta competes for qualified personnel with its other competitors in the EV charging industry, who may seek to hire Volta's employees from time to time due to their industry expertise. Volta may not be able to attract, assimilate, develop or retain qualified personnel in the future, and failure to do so could adversely affect its business, including its growth prospects and ability to expand into new markets and geographies.  [Emphasis added].

26.     On February 25, 2022, the Company filed a Form 8-K with the SEC stating that its Audit Committee determined that the Company's third quarter 2021 financial statements would be restated.  The Company stated:

On February 24, 2022, the Audit Committee of the Board of Directors (the "Audit Committee") of Volta Inc. (the "Company" or "Volta") reached a determination that the Company's unaudited condensed consolidated financial statements and related disclosures included in its Quarterly Report on Form 10-Q for ***the three and nine months ended September 30, 2021 (the "Relevant Periods") contained an understatement of stock-based compensation resulting in an understatement of the Company's net loss. The Company improperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs") to be November 8, 2021, resulting in an understatement of stock-based compensation in the Relevant Periods.*** Upon further review, the Company determined the correct grant date under Audit Standard Codification 718 for these RSUs was August 26, 2021. The impact of correcting the accounting grant date is to shift the reporting periods in which stock-based compensation expense is recognized, and the Company expects that the preliminary, unaudited adjustments to stock-based compensation will increase net loss by approximately $26.7 million for the three and nine months ended September 30, 2021.

The understatements during the Relevant Periods relate to stock-based compensation expense for certain of the Company's RSUs granted pursuant to the Company's Founder Incentive Plan, which was approved in connection with the Company's business combination with our predecessor entity, Tortoise Acquisition Corp. II, pursuant to the Business Combination Agreement and Plan of Reorganization, dated as of February 7, 2021, by and among Volta, SNPR Merger Sub I, Inc., SNPR Merger Sub II, LLC, and Volta Industries, Inc.

The Company, in consultation with the Audit Committee, has determined that (i) the unaudited condensed consolidated financial statements and similar communications by the Company relating to the Relevant Period should no longer be relied upon and (ii) ***it is appropriate to correct the error resulting in the understatements for the Relevant Periods by restating such unaudited condensed consolidated financial statements because the understatements are material to the Company's previously issued unaudited condensed consolidated financial statements***. The Company notes that:

- The adjustments do not impact revenue as presented on the consolidated statements of operations and comprehensive loss for the Relevant Period.
- The adjustments do not affect the total cash flows from operating, investing or financing activities as presented on the condensed consolidated statements of cash flows for the Relevant Period.
- While the understatements impact the timing of recognizing stock-based compensation expense, they do not impact the number of shares awarded, the timing of issuance of shares, or the aggregate amount of equity-based compensation expense to be recognized from the awards.
- The Company's management and the Audit Committee have determined the understatements were unintentional and were not the result of fraud or any other attempt to deceive.

*Preliminary Estimated Impact of Understatements*

The Company intends to restate its financial statements for the Relevant Periods, which will be addressed in an amendment to the Form 10-Q for the quarter ended September 30, 2021, to record the understatements. The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, ***resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $14.5 million and $69.7 million, respectively.*** [Emphasis added].

27.     The above statements identified in ¶¶ 18-26were false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Defendants failed to disclose to investors: (a) that the Company had improperly accounted for restricted stock units issued in connection with the Business Combination; (b) that, as a result, the Company had understated its net loss for third quarter 2021; (c) that there were material weaknesses in the Company's internal control over financial reporting that resulted in a material error; (d) that, as a result of the foregoing, the Company would restate its financial statements; (e) that, as a result of the foregoing, Legacy Volta's founders would imminently exit the Company; (f) that, as a result, the Company's financial results would be adversely impacted; and (g) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH IS REVEALED

28.     The truth began to emerge on March 2, 2022 when the Company revealed that the financial impact of the restatement was greater than previously disclosed.  The Company filed an amended Form 8-K with the SEC stating:  "The estimated financial impact of this adjustment is an

approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $69.7 million and $155.5 million, respectively."

29.    On this news, the Company's share price dropped $0.11, or 2.6%, to close at $4.01 per share on March 3, 2022, on unusually heavy trading volume.

30.    The above statements identified in ¶ 28 were false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Defendants failed to disclose to investors: (a) that, as a result of material errors in the Company's financial statements, Legacy Volta's founders would imminently exit the Company; (b) that, as a result, the Company's financial results would be adversely impacted; and (c) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

31.    The truth continued to emerge on March 21, 2022 when the Company announced that it would reschedule its fourth quarter and full year 2021 financial results, which had been expected to be released that day.  In a press release, the Company stated: "Volta Inc. ('Volta' or 'the Company') (NYSE: VLTA), today announced that it will be rescheduling its fourth quarter and year end 2021 conference call once it completes the necessary review of its financial results.  Today, the Company will file an amendment to its quarterly report on form 10-Q for the quarter ended September 30, 2021."

32.    On this news, the Company's share price fell $0.38, or 8.4% to close at $4.12 per share on March 21, 2022.

33.    On March 22, 2022, the Company filed its amended 3Q21 10-Q.  According to the explanatory note, the restatement was to correct the accounting for the Company's stock-based compensation, which had been understated:

> In connection with the preparation of the Company's financial statements for the year ended December 31, 2021, the Company reviewed its grant agreements for equity-based awards to determine stock-based compensation expense. Based on this review, the Company determined that it improperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs"), resulting in an understatement of stock-based compensation for the three and nine months

ended September 30, 2021. Stock-based compensation expense for these RSUs should have been recognized during the reporting period ending September 30, 2021 as the accounting grant date for these grants occurred during that period. The impact of correcting the error is to shift the reporting period in which stock-based compensation is recognized, resulting in an increase of previously reported net loss by $26.7 million for the quarter ended September 30, 2021. As previously disclosed in the Company's unaudited condensed consolidated financial statements for the quarter ended September 30, 2021, the Company's management and the Audit Committee of the Company's Board of Directors determined that material weaknesses existed in the Company's internal control over financial reporting due to the lack of formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions, commensurate with its accounting and reporting requirements, and due to the lack of effective control over certain information technology general controls for information systems that are relevant to the preparation of its condensed consolidated financial statements, specifically program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration. These material weaknesses in the Company's internal control over financial reporting that resulted in the understatement of stock-based compensation.

34.     The amended 3Q21 10-Q also restated the evaluation of the Company's controls and procedures to disclose that material weaknesses in the Company's internal controls led to a material error in its financial statements:

As discussed in the Explanatory Note to this Amendment No. 1 and in connection with the Restatement of our unaudited condensed financial statements as of, and for the three and nine months ended, September 30, 2021, we determined that our previously reported material weaknesses, namely that our review control over the completeness and accuracy of our stock-based compensation reporting and program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration did not operate effectively, resulting in a material error in the financial statements.

35.     The above statements identified in ¶¶ 31, 33-34 were false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Defendants failed to disclose to investors: (a) that, as a result of material errors in the Company's financial statements, Legacy Volta's founders would imminently exit the Company; (b) that, as a result, the Company's financial results would be adversely impacted; and (c) that, as a result of the

foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

36.     On March 28, 2022, the Company announced that its founders, Scott Mercer and Christopher Wendel, had resigned from their positions as CEO and President, respectively, and from the Board of Directors of the Company.  In connection with their resignations, Messrs. Mercer and Wendel "are converting their existing Class B share holdings and equity awards to Class A stock."

37.     In a Form 8-K filed the same day, the Company stated:

> Mr. Wendel's resignation is effective immediately, while Mr. Mercer will continue as Chief Executive Officer for a transition period ending on the earlier of (i) the date on which the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 is filed with the Securities and Exchange Commission and (ii) April 29, 2022. Mr. Mercer will serve as an independent advisor to the Company's board of directors (the "Board") through March 31, 2023. In connection with their resignations, each of Mr. Mercer and Mr. Wendel (the "Executives") has resigned as a member of the Board, effective immediately, Vincent T. Cubbage and Katherine J. Savitt have been appointed as Co- Chairpersons of the Board and Ms. Savitt has ceased to be Lead Independent Director.

38.     On this news, the Company's share price dropped $0.76, or 18%, to close at $3.37 per share on March 28, 2022.

## DUTIES OF DEFENDANTS

39.     By reason of their positions as officers, directors, and/or fiduciaries of Volta and because of their ability to control the business and corporate affairs of Volta, Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Volta in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Volta and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

40.     Each director and officer of the Company owes to Volta and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest

obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

41.     Defendants, because of their positions of control and authority as directors and/or officers of Volta, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Volta, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Volta.

42.     To discharge their duties, the officers and directors of Volta were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Volta were required to, among other things:

a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d)      remain informed as to how Volta conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e)      ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

43.      Each Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Volta, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

44.      Each director and officer of the Company owed to Volta the fiduciary duty to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing. In addition, as officers and/or directors of a publicly held company, Defendants had a duty not to advance their own personal, financial, or economic interests over, and at the expense of, the Company's public shareholders, or to allow other Volta directors, officers, and/or employees to do so.  Each director and officer of the Company also owed Volta and its shareholder-owners the duty to maintain the Company's confidential information and prevent others from misappropriating and/or trading while in possession of the Company's proprietary, confidential information.

45.      Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*.  Defendants' subjected the Company to the costs of defending and the potential liability from a class action lawsuit for violations of the federal securities laws.  As a result, Volta has expended, and will continue to expend, significant sums of money.

46.     Defendants' actions have irreparably damaged Volta's corporate image and goodwill.

**THE COMPANY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**

47.     The Company's Code of Conduct states: "Volta Inc. […] is committed to promoting high standards of honest and ethical business conduct and compliance with applicable laws, rules and regulations."

48.     The Company's Code of Conduct also states:

The Company expects all of its directors, executive officers, managers and other supervisory personnel to act with honesty and integrity, use due care and diligence in performing responsibilities to the Company, help foster a sense of commitment to this Code among its employees and foster a culture of fairness, honesty and accountability within the Company. The Company also expects such personnel to ensure that the Company's agents and contractors conform to the standards of this Code when working on the Company's behalf.

***

The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the [SEC] and other public disclosures are complete, fair, accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks.

49.     In violation of the Code of Conduct, Defendants engaged in or permitted the scheme to cause the Company to issue false and misleading statements to the investing public, and to facilitate and disguise the violations of law.  Further, Defendants violated the Code of Conduct by failing to act with integrity, supporting and profiting from unethical behavior, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law.  Thus, Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

**THE COMPANY'S AUDIT COMMITTEE CHARTER**

50.     According to the Charter of the Audit Committee, the Audit Committee's purpose is to:

- Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company;

- Assist the Board in oversight and monitoring of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulator requirements, (iii) the independent auditor's qualifications, independence and performance, and (iv) the Company's internal accounting and financial controls;

- Provide the Board with the results of its monitoring and recommendations derived therefrom; and

- Provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

51.     According to the Audit Committee Charter, the Audit Committee's purpose is to:

- Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company;

- Assist the Board in oversight and monitoring of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulator requirements, (iii) the independent auditor's qualifications, independence and performance, and (iv) the Company's internal accounting and financial controls;

- Provide the Board with the results of its monitoring and recommendations derived therefrom; and

- Provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

52.     According to the Audit Committee Charter, the Audit Committee's responsibilities are:

Review on a continuing basis the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure;

* * *

Review and discuss with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC; Direct the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on Form 10Q, using professional standards and procedures for conducting such reviews;

Conduct a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors;

Review before release the unaudited quarterly or annual operating results (or financial outlook or guidance) to be stated in the Company's quarterly earnings release with particular attention to any use of "pro forma" or "adjusted" non-GAAP information;

* * *

Review any reports by management or internal auditors, if any, regarding the effectiveness of, or any deficiencies in, the design or operation of internal controls and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls and review before release the disclosure regarding the Company's system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure;

* * *

Establish procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters; Review and discuss with management, the independent auditor and the internal auditor, if any, the Company's major enterprise risk exposures and the steps management has taken to monitor and control such exposures, except as to those risks for which oversight has been assigned to other committees of the Board or retained by the Board[.]

## DEMAND FUTILITY ALLEGATIONS

53.     Plaintiff will adequately and fairly represent the interests of Volta and its shareholders in enforcing and prosecuting its rights.

54.     Plaintiff brings this action derivatively in the right and for the benefit of Volta to redress injuries suffered and to be suffered by Volta because of the breaches of fiduciary duty by Defendants.

55.     Because of the facts set forth herein, Plaintiff has not made a demand on the Board of Volta to institute this action against Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

56.     The Volta Board is currently comprised of Defendants Aheto, Cubbage, Lauber, Savitt, Stewart, and Tough.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, *three* (3), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

57.     Defendants face a substantial likelihood of liability in this action because they caused Volta to issue false and misleading statements concerning the information described herein. Because of their advisory, executive, managerial, and directorial positions with Volta, Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

58.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for Volta shareholders.

59.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and is excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

60.     Any suit by the Board to remedy these wrongs would likely expose the Company to further violations of the securities laws that would result in civil actions being filed; thus, the Board

members are hopelessly conflicted in making any supposedly independent determination about whether to sue themselves.

61.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

62.     Defendants authorized and/or permitted the Company to make false statements that disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## DEFENDANTS ARE NOT INDEPENDENT

### Defendants Aheto, Cubbage and Tough

63.     Defendants Aheto, Cubbage and Tough served on the Company's Audit Committee during the relevant period.  Defendants Aheto, Cubbage and Tough violated the Audit Committee Charter by engaging in or permitting the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise Defendants' violations of law. In addition, Defendants Aheto, Cubbage and Tough violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company' disclosure controls and procedures.  Thus, Defendants Aheto, Cubbage and Tough breached their fiduciary duties, are not disinterested, and demand is excused as to them.

## FIRST CAUSE OF ACTION

**(Against Defendants For Breach Of Fiduciary Duty)**

64.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

65.     Defendants owed and owe Volta fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe Volta the highest obligation of good faith, fair dealing, loyalty and due care.

66.     Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

67.     Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

68.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Volta has sustained significant and actual damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

69.     Plaintiff, on behalf of Volta, has no adequate remedy at law.

**SECOND CAUSE OF ACTION**

**(Against Defendants For Unjust Enrichment)**

70.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

71.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Volta in the form of salaries, bonuses, and other forms of compensation.

72.     Plaintiff, as a shareholder and representative of Volta, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**THIRD CAUSE OF ACTION**

**(Against Defendants For Abuse Of Control)**

73.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

74.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

75.     As a direct and proximate result of Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.

76.     As a result of the misconduct alleged herein, Defendants are liable to the Company.  Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### (Against Defendants For Waste Of Corporate Assets)

77.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

78.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused the Company to waste valuable corporate assets by failing to disclose (i) the Company had a material weakness in its internal control over financial reporting; (ii) the Company's disclosure controls and procedures were not effective; and (iii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

79.     As a result of the waste of corporate assets, Defendants are each liable to the Company.

80.     Plaintiff, on behalf of the Company, have no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### (Against Defendants Mercer And Chadwick For Contribution Under Sections 10(b) And 21D Of The Exchange Act)

81.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.     Volta, along with Defendants Mercer and Chadwick, are named as defendants in the Securities Class Actions, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Mercer's and Chadwick's willful and/or reckless violations of their obligations as officers and/or director of Volta.

83.     Defendants Mercer and Chadwick, because of their positions of control and authority as officers and/or director of Volta, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Volta, including the wrongful acts complained of herein and in the Securities Class Actions.

84.     Accordingly, Defendants Mercer and Chadwick are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

85.     As such, Volta is entitled to receive all appropriate contribution or indemnification from Defendants Mercer and Chadwick.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff pray for relief and judgment as follows:

A.     Against Defendants in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, waste of corporate assets and violations of Sections 10(b) and 21D of the Exchange Act;

B.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

C.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: July 21, 2022

**MAGNANIMO DEAN LAW APC**

By: _____
LAUREN A. DEAN
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367
Tel:    (818) 305-3450
Fax:    (818) 305-3451
Email: Lauren@MagDeanLaw.com


THOMAS J. MCKENNA
GREGORY M. EGLESTON
**GAINEY MCKENNA & EGLESTON**
501 Fifth Avenue, 19th Floor
New York, NY 10017
Tel:    (212) 983-1300
Fax:    (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

1

## **VERIFICATION**

2        I, TOM HEIL, declare that I have reviewed the Verified Shareholder
3   Derivative Complaint ("Complaint") prepared on behalf of Volta, Inc. and authorize
4   its filing.  I have reviewed the allegations made in the Complaint, and to those
5   allegations of which I have personal knowledge, I believe those allegations to be
6   true.  As to those allegations of which I do not have personal knowledge, I rely on
7   my counsel and their investigation and for that reason believe them to be true.  I
8   further declare that I am a current holder, and have been a holder, of Volta, Inc.
9   common stock at all relevant times.

10       I declare under penalty of perjury under the laws of the United States that the
11  foregoing is true and correct.

12       Executed on July 21 , 2022.

13                                                        _____
14                                                        TOM HEIL

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1